

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| CHERYL DOWNING, ) | |
| ) | |
| Plaintiff, ) | No. 07 C 3089 |
| ) | |
| v. ) | Judge John W. Darrah |
| ) | |
| HILTON HOSPITALITY, INC., ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Cheryl Downing, filed suit against Defendant, Hilton Hospitality, Inc., alleging discrimination in violation of Title VII of the Civil Rights Act of 1964 and the Age Discrimination in Employment Act ("ADEA"). Presently before the Court is Hilton's Motion for Summary Judgment.

## BACKGROUND

Downing is a forty-nine-year-old, Caucasian, American female. (Def.'s 56.1(a)(3) Statement ¶ 4). Hilton is a 309-room hotel and banquet center located in the Lisle/Naperville area outside Chicago, Illinois. The hotel includes an internal full-service bar and restaurant. (Id., ¶ 3).

On August 4, 2005, Downing applied for a bartender position at Hilton. (Def.'s 56.1(a)(3) Statement ¶ 9). Downing interviewed with Shane Scheel, Hilton's Director of Operations. Scheel is a thirty-two-year-old, Caucasian, American male. (Id., ¶¶ 5, 10). Downing was hired as an evening bartender and began her training on August 29, 2005. (Id., ¶ 11).

Downing's training consisted of three days of training with Luis Perez ("Jose"), another bartender. Jose is a forty-three-year-old, Latino, Mexican male. (Def.'s 56.1(a)(3) Statement ¶¶ 6,

1

12). Following her training with Jose, Downing did not work with Jose but saw him "in passing." (Id., ¶ 13).

Downing was employed at Hilton for forty-seven days. During that time, Downing worked a total of 22 shifts – 13 day shifts and 9 evening shifts. (Def.'s 56.1(a)(3) Statement ¶ 15). Downing considered Scheel and Jessica Almond her supervisors during her employment. (Id., ¶ 18). When working the day shifts, Downing did not interact with any other bar staff. (Id., ¶ 16). When working the evening shifts, Downing interacted with Nil, another Hilton employee. (Id., ¶ 17).

During her training with Jose, Jose made sexual comments to Downing on two or three occasions on separate days of training. (Def.'s 56.1(a)(3) Statement ¶ 21). On one occasion, Jose witnessed a female guest's walking through the hotel and stated, "Oh, look at her ass, I'd like to do her from behind." (Id., ¶ 22). On another day, Jose stated that he would "like to do her from behind" in reference to another Hilton employee. (Id., ¶ 23). Jose also stated that he preferred women with "large fannies." (Id., ¶ 24).

During the training, Jose also asked Downing if, and how often, she and her fiancé had sexual relations and what positions they favored. (Def.'s 56.1(a)(3) Statement ¶ 25). Jose also made comments about his own sex life related to the number of women he has slept with, the number of children he had, and his preferred method of intercourse. (Id., ¶ 26). Jose did not touch or make any sexual advances towards Downing. (Id., ¶ 28). Following the three days of training, no sexual comments were made to Downing during her employment with Hilton. (Id., ¶ 29). Downing did not inform any other employee, including Scheel and Almond, that Jose had made the above sexual comments. (Id., ¶ 30).

Jose also made comments when he would walk by Downing at the hotel, such as "hey grandma" and "hey old lady." (Def.'s 56.1(a)(3) Statement ¶ 32). Downing does not know whether Jose's comments were meant to be a joke or to be mean. (Id., ¶ 33).

Jose also made fun of Americans' eating fast food and told Downing that she "might as well go to McDonalds like all the other Americans do." (Def.'s 56.1(a)(3) Statement ¶¶ 36-37). On another occasion, Nil told Downing that "all the Mexicans at work think that all white Americans are lazy." (Id., ¶ 38). No racial slurs were made toward Downing or Caucasians in general while Downing was at work. (Id., ¶¶ 39-40).

During her employment, Downing complained to Scheel and Almond that another bartender, Antonio Cuatle ("Toni"), failed to properly stock the bar when he worked the day shift. (Def.'s 56.1(a)(3) Statement ¶ 41). Toni is a fifty-year-old, Latino male of unknown national origin. (Id., ¶ 7). When she complained about Toni, Downing did not indicate that she believed Toni failed to properly stock the bar due to her gender, race, national origin, or age. (Id., ¶ 42). Downing worked the shift immediately after Toni twice during her employment. (Id., ¶ 52).

During Downing's employment, five employees worked as bartenders at the hotel bar. These included Downing, Toni, Jose, Victor Del Rio, and Stacy Janssen. Del Rio is a fifty-three-year-old, Latino male of unknown national origin. Janssen is a twenty-three-year-old Caucasian, American female. (Def.'s 56.1(a)(3) Statement ¶¶ 8, 50). During 2005 and 2006, besides Downing, nine bar and restaurant employees were terminated during Hilton's initial ninety-day probationary period. The probationary period is designed to determine if the employment relationship is "a good fit." Employment with the hotel is always "at-will." Of the nine other employees that were terminated: five were female, and four were male; one was over the age of forty, and eight were under the age

3

of forty; five were Caucasian, and four were Hispanic. (Def.'s 56.1(a)(3) Statement ¶¶45-46). One of these nine, David Orizaba, a twenty-one-year-old Hispanic male, who was employed as a server, was terminated because he "was not up to par." (Id., ¶ 47). Jennifer Garazzaro, a twenty-one-year-old Caucasian female, who was employed as a bartender and cocktail waitress, was terminated due to complaints regarding her attitude. (Id., ¶ 48). Glenny Franco, a thirty-one-year-old Hispanic female, who was employed as a hostess, was terminated during her probationary period because "it was not working out." (Id., ¶ 49). Janel Lepak, a fifty-one-year-old Caucasian, American female, who worked as a bartender, was terminated after police officers witnessed her selling alcohol to a minor. (Id., ¶ 44).

Scheel had authority to make termination decisions regarding Downing. (Def.'s 56.1(a)(3) Statement ¶ 61). Following Downing's hire, Scheel would occasionally ask bar and restaurant employees how Downing was doing and their opinion of her. No employees made any specific complaints against Downing, but their general opinion was that she was not pleasant to work with. (Id., ¶ 56). The employees' comments were significant to Scheel in light of Downing's short tenure and because they were consistent amongst the employees, including some long-term employees whose opinion Scheel trusted and respected. (Id., ¶ 57). No other member of the bar staff had such a negative image amongst co-workers. (Id., ¶ 58). Scheel also noticed that within her first weeks of employment, Downing complained that other employees were not doing their jobs. Scheel noticed that Downing was absent from her post at the bar during some of her shifts and believed that

4

she was taking smoking breaks. (Id., ¶ 59). Scheel determined that Downing was "not a good fit" for the hotel based on the general negative comments he had heard from co-workers and her consistent complaints about other employees' job performances while she appeared to take frequent smoking breaks. (Id., ¶ 60).

On October 15, 2005, Downing's employment was terminated by Scheel. (Def.'s 56.1(a)(3) Statement ¶ 19). Scheel did not seek approval or insight from any higher management at the hotel, nor did any other employee actively seek or recommend that Downing's employment be terminated. (Id., ¶¶ 61-62). Scheel orally informed Downing of her termination at the end of her day shift on October 14, 2005. (Id., ¶ 63). Scheel informed Downing that she was "not the stock" for which the hotel was looking. (Id., ¶ 64). Following her termination, Scheel prepared a memorandum setting forth the basis of her termination and placed it within Downing's personnel file. (Id., ¶ 65). Downing contacted Scheel after her termination; at which time, he told her that other co-workers did not like her. (Id., ¶ 66).

Downing believes that most of the bar staff played a role in her termination because they were jealous that she was working the "big money" nights of Friday and Saturday. (Def.'s 56.1(a)(3) Statement ¶ 67). During her tenure, Downing worked one Friday night and three Saturday nights. (Id., ¶ 51).

## ANALYSIS

Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986) (*Celotex*). All the evidence and the reasonable inferences that may be drawn from the evidence are

5

viewed in the light most favorable to the nonmovant. *Miller v. American Family Mutual Ins. Co.*, 203 F.3d 997, 1003 (7th Cir. 2000). Summary judgment may be granted when no "reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (*Anderson*). However, a party cannot defeat summary judgment by relying on unsubstantiated facts. *See Greer v. Board of Educ. of the City of Chicago*, 267 F.3d 723, 729 (7th Cir. 2001).

Downing alleges race, national origin, and sex discrimination in violation of Title VII of the Civil Rights Act of 1964.

A plaintiff may prevail on her discrimination claim either through the "direct method" – showing intentional discrimination – or through the similar burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) (*McDonnell Douglas*). *See Blise v. Antaramian*, 409 F.3d 861, 866 (7th Cir. 2005) (*Blise*). The direct method of proving discrimination requires the introduction of direct or circumstantial evidence of discrimination. Direct evidence requires, essentially, an admission by the defendant that the action was based on a prohibited animus. *See Blise*, 409 F.3d at 866.

To establish a *prima facie* case of race discrimination under the *McDonnell Douglas* framework, a plaintiff is required to demonstrate that: (1) she was a member of a protected class; (2) she was meeting her employer's legitimate performance expectations; (3) she suffered an adverse employment action; and (4) similarly situated employees not in the protected class were treated more favorably. *See Hoffman-Dombrowski v. Arlington Int'l Racecourse, Inc.*, 254 F.3d 644, 650 (7th Cir. 2001). If the employee demonstrates a *prima facie* case, the burden shifts to the defendant to demonstrate "a legitimate, nondiscriminatory reason for the action." *Blise*, 409 F.3d at 867. If

the defendant meets this burden, the burden shifts back to the plaintiff to demonstrate the proffered reason is pretextual. *Blise*, 409 F.3d at 867.

Downing argues that Scheel's use of the term "stock" when he terminated her employment is direct proof of race and national origin discrimination because the Oxford English Dictionary, 2nd Ed., includes "race" as one of the definitions of the term "stock." However, isolated, ambiguous comments do not support a finding of discrimination under the direct method. *See Ptasznik v. St. Joseph Hosp. & Resurrection Care*, 464 F.3d 691, 696 (7th Cir. 2006) (supervisor's comments that plaintiff was "too Polish" and "too old" five times over a six-month period insufficient to demonstrate direct evidence of discrimination). In addition, Scheel interviewed Downing for the position of bartender and knew that she was Caucasian and American at that time and when he offered her the position.

Nor can Downing prevail under the indirect method of proof. Downing argues that Scheel's alleged reason for terminating her employment is false and evidence of pretext because she did not receive any negative performance reviews and Jose told Scheel during Downing's training that Downing was a "nine out of ten." Downing's "proof" that she was meeting Hilton's legitimate job expectations fails to raise a genuine issue of material fact as to that element. Scheel testified that Downing was not meeting his expectations, and she was terminated for that reason. Downing's employment with Hilton was of a short duration, and a co-employee's statement during training that she was performing well and a lack of a negative performance review during a ninety-day probationary period do not demonstrate she was meeting Hilton's legitimate job expectations.

Nor is it evidence of pretext for Downing's termination. To demonstrate pretext, a plaintiff must show that the employer's explanation is unworthy of credence or that a discriminatory reason more likely motivated the employer. *Debs v. Northeastern Illinois Univ.*, 153 F.3d 390, 395 (7th Cir. 1998). Pretext in this context does not mean a mistake; rather, it means "a lie, specifically a phony reason for some action." *Russell v. Acme-Evans Co.*, 51 F.3d 64, 68 (7th Cir 1995). Downing fails to raise a genuine issue of material fact as to whether her termination was a pretext to discrimination.

Downing next argues that Jose sexually harassed her during her three days of training and created a hostile work environment by his comments during that training.

To demonstrate a hostile-work-environment claim, a plaintiff must show: (1) the workplace was permeated with discriminatory intimidation, ridicule, or insult that was sufficiently severe or pervasive to alter the conditions of the plaintiff's employment and create an abusive working environment; (2) the harassment was based on plaintiff's sex; (3) the plaintiff perceived the work environment to be hostile or abusive; (4) a reasonable person would have perceived the work environment to be hostile or abusive; and (5) the employer knew or reasonably should have known that the plaintiff was being subjected to such treatment, and it did not take appropriate corrective action. *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1246 (7th Cir.1999).

For harassment to be actionable under Title VII, the employer's actions must be sufficiently severe or pervasive so as to "alter the conditions of [the plaintiff's] employment and create an abusive working environment." *Faragher v. City of Boca Raton*, 477 U.S. 57, 67 (1986). Title VII is not directed against unpleasantness *per se* but, rather, against discrimination in the conditions of employment. *Drake v. Minnesota Mining & Mfg. Co.*, 143 F.3d 878, 885 (7th Cir. 1998) (quoting *Carr v. Allison Gas Turbine*, 32 F.3d 1007, 1009 (7th Cir. 1994)). "[W]hether an

8

environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances. These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993) (*Harris*).

Downing's claim of a hostile work environment stems from Jose's two or three "sexual" comments, detailed above, made over Downing's three-day training period.

Downing has failed to demonstrate that the alleged comments by her co-worker were so sufficiently severe or pervasive so as to alter the conditions of her employment and create an abusive working environment. Furthermore, she concedes that she did not inform a supervisor or manager of the alleged inappropriate comments and has failed to demonstrate a genuine issue of material fact whether Hilton should have reasonably known of the alleged comments.

Downing next argues that Jose's addressing her as "old lady" and "grandma" constituted age discrimination.

Downing can prevail under her age discrimination claim by either the direct or indirect method discussed above. *See Blise*, 409 at 866. It is unclear under which method Downing argues she may prevail. Downing argues, without any support, that Jose was her supervisor when he called her "old lady" and "grandma," but the undisputed facts demonstrate that Scheel was her supervisor and the individual responsible for her termination. Furthermore, Scheel did not know about Jose's comments to Downing; and, as discussed above, as the individual that hired Downing, he was aware of her age when she was hired.

Downing's age discrimination claim fails under the indirect method for the same reasons addressed above for her race and national origin claims.

9

Lastly, Downing argues that her employment was terminated in retaliation for her complaints about Toni's not stocking the bar at the end of his shift prior to her shift.

Title VII also prohibits an employer from retaliating against an employee that has complained of unlawful practices. *See* 42 U.S.C. § 2000e-3(a). An employee may present either direct or indirect evidence of retaliation. *See Humphries*, 474 F.3d at 404. Under the direct method, a plaintiff must show: (1) she engaged in a statutorily protected activity, (2) she was subjected to an adverse employment action, and (3) there is a causal connection between the two events. *See Humphries*, 474 F.3d at 404.

Under the indirect method, a *prima facie* case of retaliation requires the plaintiff to demonstrate that: (1) she engaged in a statutorily protected activity; (2) she performed her job according to her employer's legitimate expectations; (3) despite meeting her employer's legitimate job expectations, she suffered an adverse employment action; and (4) she was treated less favorably than similarly situated employees who did not engage in statutorily protected activity. If the plaintiff establishes a *prima facie* case, the employer must offer a legitimate, noninvidious reason for the adverse employment action. Once the employer does this, the burden shifts back to the plaintiff to demonstrate that the employer's proffered reason for termination is a pretext to retaliation. *See Tomanovich v. City of Indianapolis*, 457 F.3d 657, 663 (7th Cir. 2006).

Under either method, Downing has failed to demonstrate that she engaged in a statutorily protected activity. Title VII prohibits retaliation against an employee because she "has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge,

testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." *Conteras v. Suncast Corp.*, 237 F.3d 756, 764-65 (7th Cir. 2001) (citing 42 U.S.C. § 2000e-3(a).

Here, Downing complained that Toni was not stocking the bar after his shift. The complaints did not relate in any manner to any discriminatory conduct. Thus, she was not engaged in a statutorily protected activity; and her claims fails under both the direct and indirect method. In addition, Downing has failed to demonstrate a genuine issue of material fact of a causal connection between her complaints about Toni's work and her termination or that she was meeting Hilton's legitimate job expectations and that the reason for her termination was pretext to retaliation.

## CONCLUSION

For the reasons stated above, Defendant's Motion for Summary Judgment is granted.

Dated: April 8, 2008

JOHN W. DARRAH
United States District Court Judge

11